1272. Kara Ross v. Financial Asset Management Systems. Mr. Camarena. Your honors, opposing counsel, may it please the court. My name is Paul Camarena and I am counsel for the appellant in this case, Ms. Kara Ross. Ms. Ross raises essentially three issues on appeal. Unless the court has another preference, I would like to start my arguing by addressing the issue regarding the bonafide error defense in this case. I would like to ask you something. In terms of the failure to cease efforts to collect the debt, why isn't the debtor the appropriate plaintiff here rather than Ms. Ross? In other words, you. Yes. It's the debtor, after all, that triggers the protection of the statute by disputing the debt. Although Ms. Ross was the recipient of the call, there didn't seem to be any effort to collect the debt from her. If you brought the claim, on the other hand, couldn't you rely on the phone calls that your wife received? Absolutely, Your Honor. The debtor is an appropriate plaintiff, but the debtor's wife was also victimized and she's also within the scope of protection that this court has talked about in Todd v. Colecto. She also stands in the shoes of the debtor, Your Honor. In Todd v. Colecto, this court stated that non-debtors can bring claims individually on their own, in addition to debtors, as long as they stand in the shoes of the debtor. That is an awfully broad way. Is it your position that even a total stranger to the debtor receives a phone call, maybe someone with a similar name, has standing to sue under 1692 G.D.? Could Congress have really meant to authorize so many sues? My God, we'd be inundated. That's all we would have time to hear. Yes, Your Honor. 1692 G.D., by its very terms, doesn't limit the plaintiff. Other sections of the Fair Debt Collection Practices Act specifically limit who the plaintiff can be. 1692 G.D. doesn't state that this applies only to the debtor. But it talks about the consumer, and you're relying on the Todd case. And the Todd case was interpreting provision F. It was not interpreting the same provision. And in fact, when the Todd case interpreted B-2, which had similar language only, the Todd case found that that was limited to the consumer, to the debtor, not to anybody. So I don't think Todd helps you. Okay. Your Honor, I think the statutory language by itself supports this case. How? Because it talks about if the consumer notifies. It doesn't have some of the broad language that we've relied on in other provisions. Your Honor, the language of the statute says if the consumer disputes the debt, the debt collector shall cease collection of the debt. Full stop. It doesn't say it shall cease collection of the debt as to the consumer. It says it shall cease collection of the debt. That means that Congress didn't mean to limit the victims who can be victimized after the consumer disputes the debt. Of course, clearly, only the consumer can do it. Mr. Kamenar, can I ask you a question? Because it seems to me you wanted to address the bona fide defense to start with. And I'm interested in that. Because what you did here was your wife was notified of the debt, and then you sent an email to the CEO of the company. You deliberately did not follow their procedures, right? You sent the CEO an email. You looked up his email address, it seems like you're kind of, it's a game, right? You're going to send the CEO an email and then say, well, they're on notice. When the CEO says, I had no idea that I received that email. And then you say, aha, and they still contacted my wife. Isn't that exactly like the dictionary definition of a bona fide defense? Your Honor, I received a letter that was signed by Mr. Kevin H. Did he, was his email on there? Did it say, email me, the CEO of the company, if you dispute this debt. Could you imagine a world we'd live in, like what Judge Rovner was getting at, where that was the process by which you disputed debts. And once you email the CEO of the company, no matter how big the company is, no matter where in the world it's located, that's it. The company can do absolutely nothing else to attempt to collect a debt. And if they do, they get sued. Your Honor, I just didn't, I didn't just email the CEO. I also emailed the vice president who was, who was the person who sent a letter to me. But why didn't you follow the procedures that they told you to follow? Your Honor, I didn't. You're a trained lawyer. I understand that, Your Honor. And I also, I understand that as a trained lawyer, you're likely not to get, you're likely to get a more appropriate response when you go to the top. Really, really. If I had a question, like IBM, I should just email their CEO and ask. Your Honor. And he's going to respond. I doubt it. Especially when they say, follow these procedures. I mean, I think Judge Rovner is right in part. I think we'd need another circuit to deal with these types of cases if that was not a bona fide defense. Okay, Your Honor. Go ahead. I'm sorry. You can continue. Sure. Ms. Ross also raises other allegations that the violated the act. Aside from... Yes, the fact that Ms. Ross has a potential remedy under D, Section 1692D, her intent to annoy... Yes, Your Honor. And I was going to get to it. Would that tend to confirm that she lacks standing as a non-consumer for the failure to cease collection efforts under G? In other words, she has other remedies here. She does have other remedies, Your Honor, especially because D, D-5, under which she brought a complaint, specifically says that it applies to any person at the number called. And with respect to D-5, the debt collector knew that it was trying to contact the debtor, Mr. Cameron. But you agree if they're entitled to the bona fide error defense, she can't prevail on her D claims either. No, Your Honor. Well, if they are entitled to... If they're entitled to the bona fide error defense. The bona fide error defense will preclude any recovery. But the bona fide error defense should be evaluated as to both G, 1692G, and separately as to 1692D. But we don't have to get to it on G if there's no statutory standing to bring that claim. That's absolutely correct, Your Honor. The court should consider it if there's... If Ms. Ross has a claim under D-5. And importantly, with respect to D-5, Ms. Ross told the debt collector that her number was, quote, not an appropriate number for Mr. Cameron. And they continued calling. Then she went on to... She received another call from the debt collector. And the debt collector asked for Mr. Cameron's phone number. And she specifically stated, quote, I don't want to give out Mr. Cameron's phone number. And they continued calling. But she said she would pass the information on to you. On one occasion, Your Honor. On one occasion, and they called... I think it was that second call. No, Your Honor. Or the first. I thought it was the second that she answered that she said she would pass it on. She said it on the first call, Your Honor. And she was called 11 times after that. And the second time that she answered the call, she also... She specifically told him, I don't want to give out his phone number. And the debt collector continued to call. So now his question, Your Honor, is why would they continue to call when they know they're reaching someone who doesn't want to give out that phone number? So the debt collector put in information, put in evidence that they have specific procedures in place. What evidence is there to dispute that they have those procedures in place? Specifically, if somebody received an email complaining about calls or if someone, they called the wrong number and they weren't supposed to call back. I didn't see anything from you disputing that they have those procedures in place. This is right, Your Honor. My position is that those procedures which are essentially establishing a computer program that will prevent illegal calls and training their folks on that computer program is reasonably adapted to prevent any violations. I disagree with that. And the court would allow me to. I'd like to quote Judge John Tharp in another... Well, I'm looking for this particular case. I understand what your argument is. But what Your Honor, I'm not disputing that those procedures occur. Okay. So you agree that they have those procedures in place? Yes. My disagreement is whether those procedures are sufficient to maintain procedures that would reasonably prevent any violations. I see that I've run out of time. Unless the court has any questions, I will cede my place to opposing counsel. Thank you very much. Ms. Strickler? Yeah. Good morning, Your Honors. May it please the court. My name is Nicole Strickler. And I'm here today representing the Defendant Appellee Financial Asset Management Systems. Hadn't your Tamarino been the plaintiff here, do you agree he could have relied on the phone calls to Ms. Ross to support his claim under 1692 G.D.? I think it's abundantly clear from the statute, the plain language of the statute, that the consumer is the appropriate party to assert a claim under 1692 G.B. Congress knew when to use the word consumer and when to use the word person, and did so through different portions of the Act when they were trying to curb certain types of conduct. In fact, if you look at 1692 C.B., Congress actually consumer relative to that section to include the spouse. So I think that if it was true that a third party, if Congress intended a third party to have standing under 1692 G.B., they knew how to do it, and they didn't do it here. And I also think it's telling that there's absolutely no case law to ever support that a 1692 G.B. claim could be asserted by anybody else other than the consumer. So, to me... If Ms. Ross were Mr. Camarena's former spouse, or perhaps even a stranger to him, and yet Favs kept calling her, why should she not be able to claim the benefit of 1692 G.D., an intrusion into her privacy and solitude, isn't she? Well, I think, Your Honor, that what Congress intended that circumstance to cover was under 1692 B, which deals with third parties and debt collection activities that would involve third parties, which was limited to that location information sort of scenario. And so, I think you look at the language of B, you look at the language of C and G, and G was just not intended to cover third parties. It's just not in the language of the statute. So, from a standing perspective, from a statutory standing perspective, really, the G.B. claim, it doesn't hold any water. And then secondarily, we have the factual reality that none of the executives that counsel emailed ever were notified that there was a request for validation. Two of them had absolutely... After searching their emails, couldn't even locate the purported email. The third found it in a deleted folder, had absolutely no recollection of ever seeing it. And I think if you look at, again, the text of 1692 G.B., and you look at the fact that Congress said notify the debt collector in writing, it's not what happened here. Now, if he would have mailed the notice to financial asset management systems, he could have relied on the mailbox rule to prove the notice. If he would have taken some sort of other action to notify... So, you don't think email qualifies for in writing? Well, I mean, I suppose I would say it is in writing. You would or wouldn't? I'm sorry. Well, I think it's in writing. However, nobody saw it. Nobody got it. So, I think that's the evidentiary point. I'm not sitting here saying if the consumer actually sent it, someone looked at it, that wouldn't constitute notice in writing, I think, in today's time frame. But that's just not what happened here. And I think that's the underlying problem. And then third, you have the bonafide error defense on the G.B. claim, too, which is that the executives were trained what to do if they inadvertently received this sort of correspondence, how to route it, so that the account could be appropriately coded. So, I think for all those three reasons, the district court should be affirmed on the G.B. claim. And if we move to the D claim, I think there's several bases to affirm that ruling as well. First of all, if you look at the G.B. claim, it's a case that would lead to the conclusion that there was an intent to harass this woman who had offered to take messages and transmit those messages to her deader husband, and who never asked that the calls cease. The transcript of the calls, which is in the record and was relied upon by the plaintiff in the case, shows they were short. They were polite. What about the fact that the statute makes it actionable if the calls had the effect of annoying the recipient? There were 11 calls made within a short period of time, and there's evidence that there were two hang-ups during that. And I know you dispute whether or not there were two hang-ups, or who hung up. But why would that raise an issue of fact, at least, as to whether or not the effect was to annoy the recipient? Harass, oppress, or abuse the recipient, causing the telephone ring to do so. Sure. So I think what the case law shows you is you look at the pattern and the volume of the calls to determine if that's the conclusion, which I think the pattern and volume of the calls does speak to that. Why isn't that an issue of fact if you have 11 calls? Well, because I think as a matter of law under these particular circumstances, that this was not a situation where there's the natural, well, I shouldn't say natural consequence, but because really this is a 1692 D-5 claim where they have to prove intent to harass. And it's not there. There's no intent to harass. So even if you were to say, okay, maybe this would have some sort of dispute of fact that it potentially could have caused harassment, there is no intent here to do so. The undisputed facts in the record show why they called. And in the event that we were to forego that entire conclusion and rely on the bonafide error defense, again, there was policies and procedures in place. These sort of policies and procedures are standard in the industry to prevent these sort of claims where accounts are coded to prevent calls from occurring. Once those codes are entered, the system does not allow calls to go out. So those are exactly the sort of policies and procedures that are reasonably adapted to avoid these sort of errors. Yeah, but Ms. Ross has argued that although FEMS represents that it had this audit program, it didn't establish how many calls it audits. Without that sort of evidence, can a defendant really claim the benefit of the bonafide error defense? How do we know whether the audit program is genuine or it isn't? Well, I think we can, Judge Rovner, and I think it's because the testimony of the 30B6 representative who was in charge of compliance testified that there were live audits that were taking place. Now, admittedly, in her 30B6, she could not name the precise number, but I could tell you I sent text messages yesterday, but I don't recall how many I sent yesterday either, and that doesn't mean it didn't happen. It's probably quite a few. But, you know, again, the procedures here have to be reasonable. I don't think they needed an audit for those procedures to be reasonable, but they had them. And all that testimony is really uncontroverted. And, you know, as indicated by the court, there really was no evidence that was offered by the plaintiff that, you know, we didn't have those procedures in place. They're there. So really, there's no basis to reverse the district court's opinion, and in fact, it should be, should be affirmed. And unless there's other, any sort of questions the court has for me, I'll end it there. Okay. Thank you. And we'll just let Mr. Camarena have the three minutes he asked for. Thank you. Thank you, Your Honor, for affording me these three minutes. A moment ago, the court asked about auditing. I tend to agree with the Opley's concession in their response brief, where they say audit procedures are more akin to a procedure designed to identify and correct errors, that after they have occurred, rather than a procedure to prevent the error to begin with. So it can't be, the Opley has conceded that an audit procedure is not reasonably designed to prevent any such violation. But even if the Opley had not made that concession, the Opley didn't know whether they audited one out of ten calls or one out of a hundred, out of a thousand calls. Certainly it would make a difference if the security personnel downstairs would have only one person out of a thousand pass through the metal detectors. We wouldn't say by any stretch of the imagination that they have, that they have maintained procedures to prevent contraband from entering into the building. The Opley was told before that they would be questioned, that they would be examined about the bona fide error defense. And the subject of audits came up and they said, we don't have any idea what number of calls we audit. It could be one out of a hundred, it could be one out of ten, it could be one out of more than a thousand. And I would submit that auditing one out of more than a thousand is not reasonably, is not reasonably designed to prevent errors. Aside from that, Your Honors, with respect to the phone calls, of course the Opley can contest that the Opley hung up on Ms. Ross. She testified on two occasions that it was the Opley that hung up on her. Certainly the jury doesn't have to believe her. The jury can listen to her testimony and say she's not credible. The Opley did not hang up on her. But a jury can believe her. A reasonable jury can believe her and can find that the Opley hung up on her on at least two occasions. Importantly, the Opley did not raise the issue of the bona fide error defense with respect to the hangups. They simply asserted that it never happened so the Opley doesn't have to deal with it. So the jury can't rely on the bona fide error defense with respect to the hangups. Thank you for the additional time that the Court has given me. I appreciate it. Thank you, Ben, for your arguments and the case will, of course, be taken under advance.